## Thompson *et al. versus* Adams.

1. Ejectment is not well brought against administrators to compel specific performance of a contract of their decedent.

2. Such ejectment must be brought by the holder of the legal title in order to command a verdict against the equity of the purchaser, and must be against the purchaser or some one representing his title.

3. The interest of the purchaser in realty is represented by his heir, not by his administrator.

4. The Act of April 9th 1849 applies only to the executor or administrator of the vendor, on the principle that as to the vendor the land by the sale is converted into personalty.

5. Adams agreed to sell land to Engles subject to a mortgage created by Adams. The land was sold by the sheriff for the mortgage-debt and bought by Engles. *Held*, that Adams could not, by ejectment, compel specific performance by Engles of the contract.

6. Equity may compel the purchaser to pay what is due under the contract but cannot divest a title fairly acquired at a judicial sale.

7. Garrard *v.* Lantz, 2 Jones 186, and Peebles *v.* Reading, 8 S. & R. 491, remarked on.

May 27th 1867. Before THOMPSON, READ and AGNEW, JJ. WOODWARD, C. J., and STRONG, J., absent.

Error to the Court of Common Pleas of *Centre county*.

This was an action of ejectment, brought to April Term 1860, by David Adams against John Thompson and Samuel During, administrators, &c., of George B. Engles, deceased, H. Hesterline and D. C. Ammerman, for land known as the Allegheny Forge property.

The case was tried on the 22d of August 1866, at a special court; Hon. James H. Graham, president of the Ninth Judicial District, presiding.

At the trial Lewis Jamison was admitted to-defend.

The title to the land named in the writ was, on the 15th of May 1833, in John Plumb; he that day made an assignment for benefit of creditors, in which Hamilton Humes was afterwards substituted for the original assignee, who was discharged. Humes, on the 1st of August 1836, conveyed the land to Adams, the plaintiff. On the same day Adams executed to Humes a mortgage to secure $1850 of the purchase-money, payable in three annual payments of $616.66 each, with interest.

On the 1st of April 1839 Adams and Engles, the intestate, entered into articles of agreement, by which Adams sold to Engles one-half of the Allegheny Forge property, Adams to execute to Engles such title as he got from the assignee of Plumb, Engles to pay $1500, of which $1000 was to be paid presently, and the balance in a year, and the parties agreed to become partners in making iron at the forge, and also in a store at Walkersville, at some distance from the forge, on terms specified in the articles.

[Thompson *v.* Adams.]

On the 12th of May 1841 Adams and Engles entered into another agreement, by which Adams agreed that he would, on or before April 1st 1843, convey to Engles his one-half in two tracts of land, containing about 868 acres, part of the forge property, in consideration of $3900, to be paid with interest, as follows: $2000 on the 1st of April 1842, the remaining $900 to be paid April 1st 1843.  These articles contained this stipulation:—

"That notwithstanding the within stated days for the payment of the aforesaid purchase-money of $3900 are fixed for the payment of said stated sums, yet it is agreed that not any money shall be considered due, or payable by the said G. B. Engles, until all the debts due and owing by the firm of Adams & Engles at and in the store at Walkersville are fully paid, which is to be done as soon as the same can be done by collecting the debts due to said firm on account of said store."

Engles took possession of the lands, and in April 1839 paid $1000 of the purchase-money.  Humes, the assignee, recovered judgment on one of the notes given to him by Adams for the purchase-money and secured by the mortgage; under it the land was sold and deed acknowledged to A. G. Curtin, on the 27th of August 1846.  He made a deed to Engles on the 12th of July 1847, and testified that he had bought it for Engles.

Engles died in August 1853, intestate, leaving four children, his heirs; the undivided interests of three of them were conveyed to the fourth, Jeremiah D. Engles, on the 4th of August 1864; he on the 12th of the same month conveyed the land to J. J. Morris, who afterwards sold to Jamison.

This action was brought to compel the payment of the purchase-money alleged to be due to Adams under the agreement of May 12th 1841.  On the trial much evidence was offered by the defendant for the purpose of showing that Adams had not complied with the stipulations of the articles in paying the debts of the firm, and that Engles had to pay a large amount of them, and was therefore not liable for the purchase-money.  This evidence was rejected by the court below, and exceptions taken, which were not considered by the Supreme Court, the case being decided on other grounds.

The defendant submitted this point, which the court denied:—

2. "The fact that by the sheriff's sale and deed all the title of Adams was conveyed away, thus leaving him without such title, when he commenced this suit, renders it impossible for Adams to sustain this action of ejectment, and for this reason, also, the verdict must be for defendants."

The court further charged:—

"Under the facts recited, there being a large balance of purchase-money due to Adams by Engles, the plaintiff would be enti-

[Thompson v. Adams.]

tled to a conditional verdict to compel payment of the balance due.

" But the defendant contends that the legal title, by the sheriff's sale to Governor Curtin and his conveyance to Engles, became vested in Engles, and therefore the plaintiff cannot maintain this ejectment.

" But if Governor Curtin bought for Engles, and conveyed to him in pursuance of such purchase, Engles being at the time largely indebted to Adams for the unpaid purchase-money, this would not defeat the present action, but Engles would be entitled to a credit on account of the purchase-money, to the amount of what he paid Governor Curtin, in discharge of the mortgage on which the property was sold."

The verdict was for the plaintiff, to be released on the payment of $11,754.76.

The defendants took a writ of error, and assigned the answer to their point and the charge for error.

*J. B. M'Enally*, for plaintiff in error, cited Acts of February 24th 1834, § 24, Purd. 285, pl. 82, Pamph. L. 77 ; April 22d 1856, § 6, Purd. 654, pl. 13, Pamph. L. 532, § 2, Purd. 367, pl. 20 ; Gerrard v. Lantz, 2 Jones 186 ; Stephens' Executors' Appeal, 2 Wright 13 ; Brown v. Metz, 5 Watts 164 ; Barret v. Dougherty, 8 Casey 371 ; Delamater's Estate, 1 Whart. 374 ; 2 Story on Contracts, § 977 ; McCulloch v. Cowher, 5 W. &. S. 427 ; Gilliland v. Hanna, Add. 254 ; Galbraith v. Elder, 8 Watts 101 ; Foulke v. Harding. 1 Harris 242 ; Insurance Co. v. Union Canal Co., Bright R. 48 ; Alden v. Grove, 6 Harris 377 ; Shrack v. Zubler, 10 Casey 38 ; Curry v. Raymond, 4 Id. 144; Hagey v. Detwiler, 11 Id. 409 ; Hunt v. McFarland, 2 Wright 70 ; Todd v. Campbell, 8 Casey 250 ; Dugan v. Blocher, 12 Harris 28 ; Morrison v. Funk, 11 Id. 421 ; Callen v. Ferguson, 5 Casey 247 ; Epley v. Witherow, 17 Leg. Int. 356 ; Bull v. Towson, 4 W. & S. 557 ; Thompson v. McKinley, 11 Wright 353 ; Shontz v. Brown, 3 Casey 123 ; Sechrist v. Sechrist, 1 Penna R. 420 ; Foulk v. Brown, 2 Watts 214 ; Crist v. Brindle's Executors, 2 Penna. R. 262 ; Bacon Ab. 479 ; Hickman v. Walker, Willes 27 ; 16 Johns. 214 ; Durdon v. Gaskill, 2 Yeates 268 ; Dunlop v. Ball, 2 Cranch 184 ; Quince v. Ross, Taylor 155 ; 1 Phil. Ev. 119 ; 1 Fonb. Eq. 332 ; 2 Sch. & Lef. 71 ; Tilghman v. Fisher, 9 Watts 442 ; Henderson v. Lewis, 9 S. & R. 379.

*H. B. Swope*, for defendant in error, cited Kerper v. Hoch, 1 Watts 14 ; Jackson v. McGinness, 2 Harris 334 ; Brown v. Metz, 5 Watts 164 ; Devling v. Williamson, 9 Watts 318 ; Smith v. Webster, 2 Watts 486 ; Harper v. Jeffries, 5 Whart. 40 ; Renshaw v. Gans, 7 Barr 120, Mellon's Appeal, 8 Casey 127 ; Pee

5 P. F. SMITH—31

bles *v.* Reading, 8 S. & R. 490; Hauberger *v.* Root, 5 Barr 112; Dwarr. on Stat. 681; Mulock *v.* Souder, 5 W. & S. 199; Eby *v.* Eby, 5 Barr 437; Biddle *v.* Moore, 3 Barr 175; M'Quaide *v.* Stewart, 12 Wright 201; McGinnis *v.* Noble, 7 W. & S. 454.

The opinion of the court was delivered, October 31st 1867, by
AGNEW, J.—This is an action of ejectment by Adams against the administrator of George B. Engles, deceased, and two others, probably tenants in possession. Adams gave in evidence a deed of voluntary assignment from Dr. John Plumb, and a deed from Hamilton Humes, trustee by appointment of the court under the assignment, to himself; and the two contracts of sale by himself to Dr. George B. Engles, dated April 1st 1839 and May 12th 1841, each for one-half of the property known as the Allegheny Forge, and two tracts of land known as the Pinkerton and Patton tracts. On the part of the defendants it was shown that Adams had mortgaged the premises to Hamilton Humes to secure the unpaid purchase money. The mortgage was executed and recorded in 1836, before either sale of Adams to Engles. In 1839 Humes, the mortgagee, brought suit against Adams on one of the bonds secured by the mortgage, and after judgment sold the mortgaged premises upon it in 1846 to Andrew G. Curtin, who bought the property for the benefit of Dr. Engles, and conveyed it to him by deed dated June 12th 1847. The legal title, therefore, had fully vested in Dr. Engles before his death. He died in 1853, leaving issue to whom the estate descended, and in whom it was vested when Adams brought this ejectment against the administrators to compel payment of the purchase-money said to remain unpaid upon the two agreements mentioned. These agreements embraced other objects beside the sale of the real estate, the former the purchase of a store in Half Moon Valley under a co-partnership in the forge and storekeeping business; and the latter under a dissolution of the partnership and settlement of the joint affairs upon certain terms. The controversy between the parties really grows out of the other matters; but they become unimportant in the present opinion, as this ejectment cannot be maintained whatever may be the state of their affairs otherwise.

The first objection is not so material, but it may be said that the action was not well brought against the administrators. The title was not in them, but the heirs, and they did not represent it even if the purpose were to enforce payment of the purchase-money. Ejectment, as a remedy to enforce specific performance, is by rescission of contract through means of a verdict for the land itself upon the legal title, if the contract be not set up as a defence in equity; or if set up, by a verdict for the land on such condition as will secure performance of the contract, or its rescission upon a failure to perform the condition. The ejectment must

[Thompson *v.* Adams.]

therefore be brought by the holder of the legal title in order to command a verdict against the equity of the purchaser, and must be against the purchaser himself, or some one representing his title. The interest of the purchaser is realty, and is represented by his heir and not by his administrator. The Act of 9th April 1849 (Bright. Purd. 1861, 367), applies only to the executor or administrator of the vendor, and is founded in the principle that, as to the vendor, the land is converted by the sale into personalty, and the purchase money is therefore assets in the hands of his personal representative. The executor or administrator having a right to sue for and receive the purchase money, the legislature added the remedy against the land to make his pursuit more effective. But there is no reason why the ejectment should be against the personal representative of the vendee who does not represent the real estate descending to the heirs.

The chief objection is, however, that the plaintiff below had no title to support his recovery. His estate had been divested by the sheriff's sale at the suit of his own creditor, leaving no title, legal or equitable, in him. Engles had not only a right to purchase through Curtin, but was compelled to do so in self-protection against the earlier encumbrance. He bought for his own use and paid his own money, at an adversary sale, and therefore not in trust for his vendor. Adams is on no principle of law entitled to a reconveyance of the land. His title was sold from him on an adversary process at the suit of his creditor, on a prior encumbrance, and was not bought at the judicial sale, in trust for him. Equity may compel the purchaser to pay him the balance justly coming to him under the contract, but cannot divest the title fairly acquired at the judicial sale.

The plaintiff below relied upon that train of cases beginning with Tod *v.* Gallaher, 16 S. & R. 261, followed by Harper *v.* Jeffries, 5 Wharton 26; McGinness *v.* Noble, 7 W. & S. 454; Harrison *v.* Soles, 6 Barr 393; Renshaw *v.* Gans, 7 Barr 117; Dentler *v.* Brown, 1 Jones 295; Garrard *v.* Lantz, 2 Jones 186, and Mellon's Appeal, 8 Casey 121; which decide that a vendee purchasing a vendor's title at sheriff's sale cannot withhold the unpaid purchase money except so much as he had expended in buying in the title. But in none of these cases was ejectment used by the vendor to enforce the payment of the balance due to him. To suffer him to do so would contravene the theory of the action, and the intent and legal effect of the sheriff's sale. The earlier cases which introduced the doctrine of equity against withholding payment were all founded upon a note or bond given by the vendee on receiving a conveyance. The vendee it was who was driven into equity to show a failure of consideration by a sale of his title under an earlier encumbrance. Hence when the vendee was thus forced into equity, it was thought inequitable

[Thompson *v.* Adams.]

to protect him against his obligation beyond what it cost him to buy in the adverse title.

Renshaw *v.* Ganz, soon followed by Dentler *v.* Brown, was the first case in which it was held that the vendor could support an action of covenant on the articles of sale to recover the residue of purchase-money. The only principle on which these decisions can stand is, that equity will view the sheriff's sale as a medium by which the vendor's own covenant for title was performed.; for otherwise he is met by the insurmountable objection that his own covenant was broken in its most essential particular. But the very vesting of the vendor's title in the vendee by the sheriff's sale, thus in equity as well as at law, is the reason why he cannot maintain ejectment afterward. These cases were followed by Garrard *v.* Lantz, in which the equitable doctrine was extended to a case where the sheriff's sale was founded upon an encumbrance subsequent to the sale of the vendor. In arguing the propriety of compelling payment of the residue of the purchase-money, Justice Bell concedes that this equity can be administered only in an action directly for the purchase-money, and not in an ejectment because of the sheriff's conveyance. The remarks of Justice Bell that the vendee purchasing at sheriff's sale is a trustee of a beneficial interest in the land to the extent of the unpaid purchase-money is said *arguendo*, and is clearly contrary to his own concession that ejectment will not lie, and to the doctrine of trusts. A vendee who buys at sheriff's sale without fraud or express trust, who pays his own money, and who is compelled to buy in order to save his own title, can in no sense be a trustee of the land for the defendant in the execution, whether that defendant be his own vendor or any other. The remedy in equity is carried to its full limit in permitting the vendor in such a case to recover upon the contract. The doctrine of Peebles *v.* Reading, 8 S. & R. 491, pressed in the argument, is misapplied to this case. Justice Duncan there limits his own doctrine by saying: "It (ejectment) is an equitable action, and whenever chancery would *execute a trust or decree a conveyance*, the courts of this state, by the instrumentality of a jury, would direct a recovery in ejectment." But in this case there is no trust to be executed, and clearly a chancellor would not decree a conveyance, the effect of which would be to rescind or annul the sheriff's deed made at the sale of a creditor *in invitum*. The furthest he could go would be to treat the sheriff's deed as performance by the vendor to enable him to recover upon his contract. We are therefore of opinion that the plaintiff below mistook his remedy.

The other questions raised by the assignment of errors became unimportant.

　　　　　　　　　　　Judgment is therefore reversed.